J. W. McCARTY ET UX *v.* ROBERT E. BLAYLOCK ET AL

5-5241                                    453 S. W. 2d 35

Opinion delivered May 4, 1970

*Phil H. Loh* and *Cambiano & Cree,* for appellants.

*Felver A. Rowell Jr.,* for appellees and pro se.

CARLETON HARRIS, Chief Justice. Appellants, J. W. McCarty and Lucy McCarty, his wife, on December 24, 1958, sold and deeded certain property to Robert Earl Blaylock and wife. On May 19, 1959, appellees, Blaylock and Felver A. Rowell, Jr., were the grantees of another deed wherein appellants purportedly conveyed certain lands abutting and adjacent to the lands conveyed in the first deed. This latter conveyance is in question in this litigation, appellants contending that they did not execute same, and that the deed is a forgery. The McCartys instituted suit on August 26, 1968 asking that title to the lands (conveyed in the second deed) be quieted and confirmed in them. After

the filing of an answer, a reply, and amendment to answer, the case proceeded to trial and after the taking of testimony, the court dismissed appellants' complaint for want of equity. From the decree so entered, the McCartys bring this appeal.

Only four witnesses testified before the court, Mr. and Mrs. McCarty and Leo Denton[1] testifying on behalf of appellants, and Robert Blaylock testifying on behalf of appellees.

Both McCarty and his wife stated that they executed only the one deed to Blaylock, the deed of December 24, 1958. Mr. McCarty, a truck driver, testified that his log book showed that he arrived in Sallisaw, Oklahoma at 4 A. M. on May 19, 1959 (date of the questioned deed), and remained there for at least eight hours. He said he did not appear before Carroll W. Johnston, the notary who reportedly acknowledged the deed, on May 19, and Mrs. McCarty likewise stated that she did not sign the deed, and did not appear before Johnston to have any papers notarized. She said that she was at home in West Memphis on that date.

Blaylock testified that he met the McCartys at Johnston's office where the deed was prepared, and that both McCartys signed the deed. Blaylock further stated that the agreed purchase price for the property, $800.00, was paid at that time. McCarty admitted that he had been paid $800.00 as total consideration for property to be deeded to Blaylock, but he contended that the property purchased was other than that de-scribed in the deed.

We agree with the chancellor when he said, "It is found that the deed is not a forgery. No other con-clusion is possible under the admitted facts in this case".

---

[1]Denton had been interested in buying some land from McCarty but on examining the tax books, went back to McCarty and, "told him he did not have as much land as he told me he had according to the tax books". The witness knew nothing about the alleged forgery.

The evidence reflects that the McCartys had deeded the property here in litigation to Frank E. Hampton and wife on December 7, 1956. McCarty admitted that Blaylock had come to him and asked to buy the property, but McCarty advised he had already sold it to Frank Hampton.

"And he wanted to know if I could get the lot from Frank. In the meantime he had made several calls to Frank to buy the lot, and Frank told him he couldn't sell that lot back to it [him] because I hadn't put a road down through there. And he just let me have it back. And I told Blaylock, I couldn't sell him a full sized lot because there had to be a 30 foot road put down through there. * * * *

"So then after I got the lot back from Frank, I told him I would have a wide strip down through here which would have been 40 feet width."[2]

Blaylock testified that McCarty told him that the land had been sold to Hampton with the understanding that Hampton would sell it back to him if the latter did not decide to build on it. "He told me about this thing of Mr. Hampton and he said that Mr. Hampton hadn't built on. Been quite a while. Which evidently he did. And he told me one day he was ready to sell it and we met down here at Carroll Johnston's office and fixed it up."

The circumstances support appellees. Hampton and wife deeded the property they had purchased earlier from the McCartys back to appellants on May 19, 1959, which is the exact date of the McCarty deed to appellees. This certainly adds weight to the contention of appellees. Then we find an unusual occurrence. Though McCarty stated that he was given the $800.00 (at his home), he did not give Blaylock a deed to the 40 foot strip that he contends he was selling to ap-

___

[2]This strip was roughly something over 200 feet long and according to the witness, was the only part of the so-called Hampton property that was to be sold to Blaylock.

pellees. Appellant said that Blaylock "caught me the morning I started to work and I told him I did not have time to draw him up a deed." He said that he subsequently gave Blaylock the deed wherein the Hamptons had conveyed the property back to the McCartys, for them to "hold", apparently as security.[3] This was, of course, a little unusual, but not as much so as the fact that, though receiving the $800.00 in 1959, the McCartys, according to their testimony, have never yet deeded the strip that appellants say appellees were to receive from the $800.00 consideration. If this is correct, Blaylock was both extremely patient and extremely careless.

McCarty admitted that the signature on the deed acknowledged by Johnston "resembles my signature", and we agree that there is a close resemblance in McCarty's signatures on the various deeds and also a signature specimen offered as evidence in the case. It is also noteworthy that, though McCarty testified that he learned in 1963 of the deed herein questioned, no action was taken for about five years. This is hardly the normal way a person acts when he has lost land through a forgery.

Be that as it may, we think the proof heavily preponderates in favor of appellees and we cannot agree that the court erred in dismissing the complaint.

Affirmed.

---

[3] "I told him I couldn't sell him the lot, but he still insisted he wanted the 40-foot strip so his land would be on one side and mine would be on the opposite side. So I told him he could have it and he paid me for it. Then after that, I told him I didn't have time to make him up a deed. Then he came over one morning when I started to Russellville and that was the time I handed him the deed that I got from Frank Hampton. And I told him, I says you can hold this deed till I get down and draw you up a deed."